UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HUSCH BLACKWELL, LLP,

        Plaintiff,

    v.

DEPARTMENT OF COMMERCE, et al.,

        Defendants.

Civil Action No. 24-2733 (JDB)

**DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF APPLICABILITY OF FOIA EXEMPTIONS 1 AND 3 TO THE DISPUTED RECORDS**

Defendants, the Department of Commerce and its Bureau of Industry and Security ("BIS"), by and through undersigned counsel, respectfully submit this memorandum in response to the Court's October 17, 2025 order[1] requiring supplemental briefing as well as declarations or an updated *Vaughn* index to provide additional support for their position that Freedom of Information Act ("FOIA") Exemptions 1 and 3 apply to the records remaining in dispute (ECF No. 32). In response to the Court's Order, Defendants submit the attached detailed declarations providing further information to support the withholding of sensitive national security information protected from release under FOIA Exemptions 1 and 3. Defendants also submit an updated *Vaughn* index (Ex. 1). For the reasons explained herein, Defendants respectfully request that the Court find that

---

[1] This supplemental brief originally was due November 5, 2025. However, due to a lapse in appropriations that lasted from October 1 through November 12, 2025, the due date was automatically extended to December 29, 2025. On December 22, 2025, Defendants filed an unopposed motion for extension of time. The Court granted that motion and extended the due date to February 2, 2026.

they properly invoked FOIA Exemptions 1 and 3 for the documents that remain in dispute and grant summary judgment in Defendants' favor.[2]

## ARGUMENT

### I.    <u>Exemption 1 Was Properly Applied to Document 121.</u>

FOIA Exemption 1 protects from disclosure information that is "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1) (A); *see also ACLU v. United States DOJ*, 640 F. App'x 9, 10 (D.C. Cir. 2016). Here, the applicable Executive Order is Executive Order 13526 of December 29, 2009, *Classified National Security Information* (75 Fed. Reg. 707). According to § 1.1(a) of this Executive Order, four criteria must be met for original classification:

> (1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or is under the control of the United States Government; (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

In the attached Declaration of Carmen Quesenberry, Defendants provide additional information to support the withholding under Exemption 1 of the 13 pages at issue (pages 000514-000526), as those pages meet each of E.O. 13526's four requirements. *See* Quesenberry Decl. ¶¶ 10-19.

---

[2]    *See* Plaintiff's Status Report of October 3, 2025 (ECF No. 30) for Plaintiff's list of documents still in dispute. The list includes 31 records divided into 12 different categories. BIS asserted Exemption 3 over all these documents except for one. As to that document, BIS asserted FOIA Exemption 1. Upon further review of the 30 documents over which BIS asserted Exemption 3, BIS has determined that six of them are not responsive to the Plaintiff's request because they do not mention or relate to Yangtze Memory Technologies Company ("YMTC"). *See* Boucher Decl. ¶ 3. If the documents are nevertheless found to be responsive, they are subject to Exemption 3 for the same reasons and to the same extent as the other documents at issue in this case.

Here, another federal agency has original classification authority to classify this information, and did so, and the classified material is owned by, produced by, or under the control of the United States Government. *Id.* ¶ 12. The material pertains to § 1.4(a) ("military plans, weapons systems, or operations"); § 1.4(b) ("foreign government information"); § 1.4(c) ("intelligence activities (including covert action), intelligence sources or methods, or cryptology"); and § 1.4(d) ("foreign relations or foreign activities of the United States, including confidential sources"). *Id.* ¶ 13. Additionally, Defendants have confirmed that the original classification authority determined that the unauthorized disclosure of the information reasonably could be expected to result in exceptionally grave damage to national security, and the original classification authority is able to identify or describe the damage. *Id.* ¶ 12.

The record in question has been classified as Top Secret. As further explained in the Quesenberry Declaration, disclosure of this information could reasonably be expected to cause exceptionally grave damage to national security by (1) revealing specific enforcement methodologies and analytical frameworks used to detect illicit technology transfers, enabling foreign adversaries to circumvent U.S. controls; (2) exposing the identities of foreign partners, intelligence sources, or investigative targets, which could compromise ongoing operations, deter future cooperation, and endanger personnel; (3) disclosing technical parameters and thresholds associated with export restrictions, allowing hostile entities to design around U.S. controls or identify vulnerabilities in the regulatory framework; and (4) undermining diplomatic and interagency coordination, as disclosure of sensitive deliberations could damage trust and impede the free exchange of classified information among allies. *Id.* ¶ 17.

The classified material also contains information regarding intelligence activities and sources and methods authorized under the Foreign Intelligence Surveillance Act of 1978 ("FISA"),

50 U.S.C. § 1801 *et seq. See* Quesenberry Decl. ¶ 14. Disclosure of this information could reasonably be expected to cause exceptionally grave damage to national security by revealing sensitive collection capabilities and targets of foreign intelligence surveillance. *Id*. The document is classified as FISA-derived information, collection methods or targeting procedures so its contents are automatically intertwined with classified intelligence activities under Executive Order 13526. *Id*. ¶ 18.

With the additional information provided in this brief and the accompanying Quesenberry Declaration, Defendants submit that they have met their burden to substantiate that they properly asserted FOIA Exemption 1 over Document 121. *See Larson v. Dep't of State*, 565 F.3d 857, 863 (D.C. Cir. 2009) (determining on appeal that the CIA properly asserted Exemption 1 when its affidavit "described with reasonably specific detail the reason for nondisclosure: the importance for continuing intelligence operations of keeping intelligence sources and methods classified and confidential"). Because this threshold has been met, Defendants are entitled to "substantial deference to the government's determination that information has important national security implications, and that the disclosure of such information would have [foreseeable] harmful ramifications for national security." *See Leopold v. United States DOJ*, 697 F. App'x 9 (D.C. Cir. 2017) (citing cases).

## II.    Exemption 3 Applies to the Remaining Documents at Issue.

In its most recent opinion, this Court determined that the Export Control Reform Act ("ECRA")'s confidentiality provision at 50 U.S.C § 4820(h)[3] meets the requirements of a FOIA

---

[3]    ECRA's confidentiality provision reads, in relevant part:

(A) In general
Information obtained under . . . subparagraph (B) shall be withheld from public disclosure and shall not be subject to disclosure under section 552(b)(3) of title 5, unless

Exemption 3 statute. *See* Mem. Op. (ECF No. 33) at 10. The Court, however, stated that more information was needed to determine whether the withheld memoranda fall within the scope of the confidentiality provision—specifically, whether they "include 'information submitted or obtained in connection with' ECRA 'operations' similar to the preceding categories of activities or ensuing list of examples. 50 U.S.C. § 4820(h)(1)(B)." *Id.* at 14-15. Defendants have provided additional information in the Quesenberry Declaration to establish that the information withheld under Exemption 3 is within the scope of 50 U.S.C. § 4820(h)(1)(B).

For information to be protected from disclosure under ECRA's confidentiality provision, it has to fall within one or more of the categories described in 50 U.S.C. § 4820(h)(1)(B): "information submitted or obtained in connection with an application for a license or other authorization to export, reexport, or in-country transfer items or engage in other activities, a recordkeeping or reporting requirement, an enforcement activity, or other operations under this subchapter, including— (i) the license application, license, or other authorization itself; … and (iii) license determinations, and information pertaining thereto [.]" For the "other operations"

---

the release of such information is determined by the Secretary to be in the national interest.

(B) Information described
Information described in this subparagraph is information submitted or obtained in connection with an application for a license or other authorization to export, reexport, or in-country transfer items or engage in other activities, a recordkeeping or reporting requirement, an enforcement activity, or other operations under this subchapter, including—
(i)     the license application, license, or other authorization itself;
(ii)    classification or advisory opinion requests, and the response thereto;
(iii)   license determinations, and information pertaining thereto;
(iv)    information or evidence obtained in the course of any investigation; and
(iv)    information obtained or furnished in connection with any international agreement, treaty, or other obligation.
…

category, the Court determined that the activity must be similar to the activities in the preceding categories or to the non-exhaustive list of examples that follow the listed categories.  See Mem. Op.  (ECF No. 33) at 12-14.

The memoranda withheld by BIS were submitted to the End-User Review Committee ("ERC") and the Advisory Committee on Export Policy ("ACEP") as part of the process for determinations on changes to the Entity List.  Defendants have properly asserted Exemption 3 over those records because Entity List activities are similar to, and closely linked with, the licensing activities listed in 50 U.S.C. § 4820(h)(1)(B). *See* Quesenberry Decl. ¶¶ 21-26. For example, Documents 112, 114, and 118 in the attached *Vaughn* index are versions of a withheld memorandum prepared for the ERC members that lists entities proposed for inclusion on the Entity List along with supporting information such as (1) trade data reported in confidential Electronic Export Information ("EEI") submissions through the U.S Automated Export System; (2) information from a BIS export license application; (3) information obtained by BIS Export Enforcement in the course of an investigation; and (4) BIS all-source analysis of the entities being considered.

Along with the categories and examples listed at subsection (h)(1)(B), the Entity List is central to the administration and enforcement of the export control scheme established by ECRA as a means through which certain license requirements are determined.  As further explained in the Quesenberry Declaration, at paragraph 21, one of the statutory responsibilities given to the Secretary of Commerce, in consultation with the Secretaries of State, Defense, and Energy, and the heads of other federal agencies as appropriate, is to "require licenses or other authorizations, as appropriate, for exports, reexports, and in-country transfers of controlled items, including— (A) imposing conditions or restrictions on United States persons and foreign persons with respect to

such licenses or other authorizations; and (B) suspending or revoking such licenses or authorizations." 50 U.S.C. § 4813(a)(5). Here, Congress is expressly noting that part of licensing is "imposing . . . restrictions . . . with respect to such licenses or other authorizations." *Id*.

Simply put, licensing requirements or restrictions, including those resulting from the Entity List process, are just the other side of the same licensing coin—issuing a license is the affirmative side of the coin, allowing certain export activities in accordance with the license, while license requirements or restrictions are the opposite side, prohibiting certain export activities other than pursuant to, and in compliance with, the license.[4] For both sides, the strict confidentiality provided by 50 U.S.C. 4820(h)(1)(B) is essential to protect these processes based on similar considerations regarding the nature of the information and determinations involved. Document 14 in the attached *Vaughn* index is an example of a document that demonstrates the link between the Entity List and export licensing. This document is a memorandum addressed to the ACEP regarding additions to the Entity List, and includes conclusions based on BIS's analysis regarding the need to apply a particular license review policy to Yangtze Memory Technologies Company, and it discusses the sources used in that analysis.

With these interlocking confidentiality concerns with BIS's licensing operations, the Entity List process is precisely the type of "other operation" contemplated by section 4820(h)(1)(B).[5] *See*

---

[4] The Export Administration Regulations ("EAR") illustrate the direct link between licenses and the Entity List, stating: "A license is required, to the extent specified on the Entity List, to export, reexport, or transfer (in-country) any item subject to the EAR when an entity that is listed on the Entity List, or any entity using an address identified on the Entity List as presenting a high risk of diversion to activities of concern, is a party to the transaction [.]" 15 C.F.R. § 744.11(a).

[5] Although there is no legislative history for ECRA that sheds light on the meaning of "other operations" within its confidentiality provision, Defendant's longstanding practice under the predecessor confidentiality provision has been to protect the confidentiality of the Entity List process. Although that predecessor statute, section 12(c)(1) of the Export Administration Act of 1979, did not include the "other operations" language or specific examples, it was broad enough to cover the Entity List process or other operations closely related to licenses. Section 12(c)(1)

*Durnan v. U.S. Dep't of Commerce*, 777 F. Supp. 965 (D.D.C. 1991) (holding that the predecessor statute to the ECRA qualified for FOIA Exemption 3).

Additionally, given the national security implications of export licensing, the Court should take a broad view when interpreting ECRA's confidentiality provisions. The Supreme Court has held that the "the national security interests and potential risks at stake" from disclosure under another Exemption 3 statute, section 102(d)(3) of the National Security Act, then 50 U.S.C. § 403(d)(3), and currently codified at 50 U.S.C. § 3024(i)(1), made agency decisions to invoke the exemption "worthy of great deference." *See CIA v. Sims,* 471 U.S. 159, 179 (1985).

Moreover, information the ERC reviews includes "information submitted or obtained in connection with [...] a recordkeeping or reporting requirement," 50 U.S.C. 4820(h)(1)(B), in particular, EEI filings by exporters with the U.S. Government. *See* Quesenberry Decl. ¶ 27. The EEI, which collects basic information about the parties to an export transaction, the items being exported, and the license authorities for the export, is used by the Department of Commerce to collect trade statistics and for export control purposes. *See id.* ¶ 28. The EAR requires exporters to file an EEI in certain circumstances outlined in 15 C.F.R. § 758.1. As EEIs are considered "export control documents" as defined in 15 C.F.R. § 772.1, the EAR's recordkeeping requirements also require exporters to retain EEIs for five years and to make them available for inspection by BIS. *See* 15 C.F.R. §§ 762.2(a)(1), 762.6(a). As stated in paragraphs 27-28 of the Quesenberry Declaration, and as discussed throughout Part 758 of the EAR, BIS uses the EEI to evaluate

---

protected "information obtained for the purpose of consideration of, or concerning, license applications under this Act." *See* Export Administration Act of 1979, 93 Stat. 503, 531 (Sept. 26, 1979). There is no indication that Congress intended to limit that protection in enacting ECRA; instead, the inclusion of the "other operations" category and additional language in ECRA indicates that Congress intended to continue or expand, rather than limit, the scope of the confidentiality provision.

individual export transactions and license applications, as well as to prevent diversion of items to unauthorized end users or end uses.  As such, EEIs are not only central to BIS's licensing and enforcement functions, but to the ERC's work of evaluating the appropriateness of end-user-based license requirements.

Finally, here, the documents withheld under Exemption 3 include information that was obtained as part of the government's enforcement related investigations and other enforcement activities. *See* Quesenberry Decl. ¶¶ 29-32. Disclosure of these documents could compromise the effectiveness of BIS Export Enforcement Special Agents acting under 50 U.S.C. § 4820(a). Disclosure also would inhibit the BIS Export Enforcement's Office of Enforcement Analysis's ability to receive information necessary to compile Entity List recommendation packages. *Id.* ¶ 32. Because this information fits the category identified in 50 U.S.C. § 4820(h)(1)(B)(iv) ("information or evidence obtained in the course of any investigation"), it is protected from disclosure under that statute and thus falls under FOIA Exemption 3.

## CONCLUSION

For these reasons, Defendants request that the Court determine that Defendants properly asserted Exemption 1 over pages 000514 to 000526 and Exemption 3 over the remaining documents in dispute.

 Dated: February 2, 2026                Respectfully submitted,

                                        JEANINE FERRIS PIRRO
                                        United States Attorney

                                        By:        */s/ Derrick Petit*
                                        DERRICK PETIT
                                        Assistant United States Attorney
                                        601 D Street, NW
                                        Washington, DC 20530
                                        (202) 252-2550

*Attorneys for the United States of America*